William **HAYES**

v.

**PENNSYLVANIA LAWN PRODUCTS, INC. et al.**

**Civ. A. No. 70–1197.**

United States District Court, E. D. Pennsylvania.

May 3, 1973.

Herbert Monheit, Philadelphia, Pa., for plaintiff.

Patrick J. O'Connor, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a products liability personal injury case. It is before us on plaintiff's motion for a new trial or judgment n. o. v. following a jury verdict for defendant. Plaintiff was injured by a small object shot from the discharge chute of a rotary power lawn mower. He sued the manufacturer of the mower on two alternative theories: (1) negligence in design or manufacture; (2) strict liability for unreasonably dangerous defective products.[1] After a three-day trial, the case was submitted to the jury on special interrogatories. The jury found as follows: (1) the defendant was not negligent; (2) the plaintiff was contributorily negligent; (3) the plaintiff's contributory negligence was a proximate cause of his injury; (4) the mower was not defective; (5) the plaintiff assumed the risk of the injury. Plaintiff's motion for new trial or judgment n. o. v. claims that the verdict was contrary to the evidence, that we erred in admitting certain photographs into evidence, and that we also erred in failing to charge the jury in accordance with certain of plaintiff's points for charge dealing with the strict liability aspect of the case.

The accident occurred when plaintiff walked in front of the discharge chute of the mower, which he had left idling on the sidewalk while he went to pick up

---

1. Restatement (Second) of Torts § 402A (1965), which is the law of Pennsylvania, Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966), reads as follows:

    (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

    (a) the seller is engaged in the business of selling such a product, and

    (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

    (2) The rule stated in Subsection (1) applies although

    (a) the seller has exercised all possible care in the preparation and sale of his product, and

    (b) the user or consumer has not brought the product from or entered into any contractual relation with the seller.

something in its path. As he passed the chute, an object was thrown from it and lodged in plaintiff's right knee. Plaintiff introduced evidence of three alleged defects: (1) the absence of a guard to block or deflect objects thrown from the chute; (2) the design of the mower in a manner allowing objects to be thrown out at a dangerously high angle; (3) a defective blade from which a piece of metal became dislodged and was hurled out the chute. Plaintiff produced the expert testimony of Walter Van Ness Pruyn, a mechanical and automotive engineer and self-styled "impactologist" with a background in mechanical design, to support these contentions.[2]

Defendant produced two experts. One was Donald Gordon, the designer of the mower, who holds a doctorate in chemical engineering and considerable experience in the manufacture of machinery. Gordon is a member of the American Association for the Advancement of Science, American Chemical Society, American Society of Manufacturing Engineers, and American Society for Metals. The other was Gilbert Buske, a mechanical engineer and member of the Society of Automotive Engineers. Buske had ten years' experience in the manufacture of chain saws, pumps, generators, demolition saws, and lawn mowers, and had designed lawn mowers for four companies for eighteen years. He also served as chairman of the committee of the independent American Standards Association that formulated the lawn mower standards promulgated in 1960 for the manufacturers' association, the Outdoor Power Equipment Institute (OPEI), and he had also worked on the 1964 standards involved in this case. Gordon testified that the mower complied with the applicable safety specifications of the OPEI with respect to both the maximum angle of discharge and the minimum distance between the tip of the blade and the outside edge of the discharge chute. He further testified that the standards did not call for a guard in any mower meeting the distance requirement. He testified that an instruction booklet supplied with each mower warned that it is dangerous to stand or walk in front of the discharge chute. Buske also testified that in his opinion the mower complied with the applicable standards for angle of discharge and blade-to-chute clearance, and that the mower was safe and not unreasonably dangerous. And Buske emphasized that a person should not cross in front of the discharge chute.

## II. *Sufficiency of the Evidence*

■ Plaintiff's sufficiency of the evidence claim is plainly lacking in merit. There was ample evidence from which the jury could conclude that the plaintiff was contributorily negligent and assumed the risk of the injury; those two findings alone would sustain the judgment for defendants because contributory negligence is a bar to an action based on negligence and assumption of risk is a bar to an action based on § 402A.[3] On cross-examination the plaintiff testified that just prior to his injury he walked around the left side of the mower because "I wanted to avoid the chute." The accident having occurred when he completed his trip around the mower by walking back on the right side of the mower, past the open chute, he was subsequently asked "And you were aware, I take it, that it was dangerous to walk in front of that chute with the blades spinning, were you not?" His answer was "I was aware, right."

■ In addition, there was abundant evidence to support the jury's other special findings that the mower was neither defective nor negligently designed or

2. We permitted Mr. Pruyn to testify over objection that he lacked the requisite expertise in the field in question.

3. The jury also found that plaintiff's contributory negligence was a proximate cause of his injury. We have no problem sustaining this finding because the finding of contributory negligence could have been (in fact, undoubtedly was) based on the plaintiff's walking in front of the discharge chute; the causal nexus is thus self-evident.

manufactured. As we have noted, there was testimony by Gordon and Buske that the mower conformed to safety regulations. Moreover, Buske testified that the flying object could not have been a broken piece of the cutting blade; that the object must have been sucked into the mower by the vacuum or shaken loose from the grass and debris stuck to the underside of the mower, and that the discharge chute was not defective despite its being unguarded, because the chute met the 3″ blade-to-housing-clearance and angle-of-discharge requirements. The defendant also presented evidence that the safety specifications were not intended to prevent the kind of injury suffered by the plaintiff. According to both Gordon and Buske, the reason for setting the blade back three inches from the discharge chute opening was to prevent users from getting their hands or feet caught in the blade and not to prevent missile injuries. The purpose of the discharge angle limitation, Gordon said, was not to prevent injuries altogether, but rather to restrict impacts of foreign objects coming out to the lower part of the body rather than the upper part.

In addition to the foregoing, Buske testified that the mower was not unreasonably dangerous, in that it was "as safe as any rotary mower. It would be a safe mower to run, to buy and use." Indeed, Buske testified that there was no type of guard that could have prevented this type of injury without rendering the mower useless or substantially less useful for cutting grass.[3a] While Pruyn's testimony was contrary to most of the evidence summarized above, the resolution of the disagreement among experts was a task for the jury, and they were properly free to credit all, part, or none of each witness's evidence. Viewing the evidence in the light most favorable to the defendant, there was abundant evidence to support the verdict.

In sum, the jury's verdict was not only not contrary to the evidence, but was in fact in accord with the substantial weight thereof, especially on the contributory negligence and assumption of risk points.

### III. *Admission of Photographs of Another Lawn Mower*

■ Over plaintiff's objection, defendants introduced into evidence five photographs, Exhibits D–4 through D–8, of a lawn mower which Gordon identified as belonging to his neighbor and being the same model as the lawn mower involved in the accident.[4] Gordon, as the designer of the mower, was eminently competent as a witness to testify to the model number of the mower he photographed. The photographs were used not as substantive evidence, but rather only to illustrate and clarify Gordon's testimony regarding the method by which he measured the neighbor's mower for compliance with OPEI specifications. Thus the photographs actually showed the measurements in progress: the placement of the ruler, the use of wire to define the end of the chute opening, and the use of a piece of tape to reconstruct the original size, before wear, of the blade. Plaintiff also objected on the grounds that the photographs showed a different mower from the one involved in the accident. We note, however, that plaintiff's expert had photographed and examined the original mower, and that it was then disposed of without being made available to the defendant. Thus if defendant was to have an opportunity to present any expert testimony, it would have to be based on a different mower of similar characteristics. The evidence

---

3a. Under section 402(a), "unreasonableness" of a dangerous design is measured in part by the feasibility of eliminating the danger "without seriously impairing the usefulness of the product or making it unduly expensive." Dorsey v. Yoder Co., 331 F.Supp. 753, 760 (E.D.Pa.1971),

aff'd mem., 474 F.2d 1339 (3d Cir. 1973), quoting Wade, Strict Liability of Manufacturers, 19 Sw.L.J. 5, 17 (1965).

4. In his motion, plaintiff did not assign as error the admission of these photographs but he has briefed the point.

that the neighbor's mower was similar was quite strong, and we in our discretion allowed the evidence in. Such minor differences as did exist between the two mowers in the photographs were carefully pointed out to the jury by plaintiff's counsel and we instructed the jury that the asserted discrepancies between the two machines was a factual matter for them to consider.

## IV. *Alleged Errors in the Charge*

Plaintiff has assigned as error our failure to charge the jury in accordance with plaintiff's points for charge numbered 8, 10, and 11. In essence these points requested that we instruct the jury specifically with respect to the plaintiff's theory that the missile injuring plaintiff was a piece of the mower blade which became detached because the blade was defective. The only evidence at trial in support of this theory was that (1) the hospital record and x-ray report indicated that a small piece of metal was imbedded in the bone near the right knee, and (2) Pruyn expressed the opinion that if the object imbedding itself in the plaintiff's knee was a foreign metal body 10 millimeters long and 1 millimeter wide, then the source of the object was the blade itself. Pruyn's basis for his opinion was that since the mower had been running stationary on plaintiff's level, clean macadam driveway for ten seconds before the object was thrown from the chute, any foreign objects on the pavement would have been thrown from the chute before the ten seconds had elapsed; therefore "the only source would be the blade itself."[5] In answer to the same hypothetical question, while Buske answered, "It could have been a part of the blade . . .", he also testified at another point that the missile could not have been a piece of the blade. His reasoning was that the

blade would not break unless it hit something. He had never heard of a blade breaking when it was not in contact with anything.[6] In Buske's opinion, the missile was shaken loose from the underside of the mower deck where it was imbedded in encrusted grass, or else was sucked under the mower by the vacuum generated by the spinning blade.

We refused to give the charge requested by plaintiff not because we intended to withdraw the defective blade theory from their consideration but rather because we preferred to submit all of plaintiff's theories together with one general instruction to avoid the possibility of drawing unequal attention to any one theory. We charged the jury as follows with respect to whether there was a defect:

Now, in order to hold the defendant liable, you must first find that the lawn mower was sold in a defective condition—when it left the plant it was in such a defective condition, as I will come to in a few moments, unreasonably dangerous to the user or consumer. Now, the defective condition may be a physical flaw in the production or imperfect workmanship, or it may be defective design, or it may be an inadequate warning. . . .

Clearly our charge was broad enough to encompass a defective blade as well as absence of a guard and improper angle of discharge. At no time did we remove the defective blade theory from the case. We specifically told counsel that they could argue that issue; counsel did so; and we never told the jury not to consider the evidence of a defective blade. Our charge did not focus on any of the alleged defects; we did not single out the defective blade theory for purposeful omission. Even if plaintiff's requested points were technically a correct state-

---

5. Pruyn examined the mower but if he looked at the blade to see if a piece was missing, he did not testify on that subject.

6. As noted, Buske was active in the lawn mower industry and the jury might have

inferred from his testimony that if he had never heard of such a situation, it had never happened, and might be unlikely to have happened here.

ment of the law, it is settled law in this Circuit that:

> A party has no vested interest in any particular form of instructions; the language of the charge is for the trial court to determine. If, from the entire charge, it appears that the jury has been fairly and adequately instructed, as we find it was, then the requirements of the law are satisfied.

Shaw v. Lauritzen, 428 F.2d 247, 251; (3d Cir. 1970), quoting from James v. Continental Ins. Co., 424 F.2d 1064 (3d Cir. 1970); *see* Eulo v. Deval Aerodynamics, Inc., 47 F.R.D. 35, 44 (E.D.Pa. 1969), rev'd on other grounds, 430 F.2d 325 (3d Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971); 5A J. Moore, Federal Practice ¶ 51.06 (1971 & Supp. 1972). We charged comprehensively on the subject of strict liability and we believe that we gave the jury all the applicable law; no exception was taken to our § 402A charge other than as we have herein noted. Defense counsel devoted part of his closing argument to the issue of the defective blade. This should have been sufficient reminder to the jury that the condition of the blade was an issue in the case.

There is still another reason why plaintiff's claim of an erroneous charge must fail, for we have concluded that the evidence on the defective blade theory was insufficient to go to the jury anyway. This conclusion is not inveighed against by the fact that there indeed

was sufficient evidence to support a finding that the missile was a piece of metal from the blade. Indeed, even without any testimony to that effect, we think a jury could reasonably conclude that a blade that could spin off a piece of metal was defective, and that the defect was unreasonably dangerous. However, in a 402A case the plaintiff must prove more than an unreasonably dangerous defect existing at the time of the injury; he must also prove that the product was in a defective condition *at the time it left the hands of the seller;* the seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful at the time it is used.[7] Plaintiff adduced no evidence on this issue. Since the mower was in its second summer of use, the blade could have been weakened since its purchase by collisions with stones, pavement, and various obstacles. A plaintiff can introduce either (1) direct proof of the existence of a specific defect at the time of sale, or (2) proof of (a) a defect at the time of use *and* (b) the absence of other causes of the accident other than a defect existing at the time of purchase. In this case the plaintiff did not present evidence of (1), and he presented evidence of (2)(a) but not (2)(b). In such a situation, he had no right to get to the jury with his claim of a defective blade. Burchill v. Kearney-National Corp., 468 F.2d 384 (3d Cir. 1972);[8] Kaczmarek v. Mesta Mach. Co., 463 F.2d 675 (3d Cir. 1972);[9] Greco v. Buccioni Eng'r Co., 407 F.2d 87 (3d Cir. 1969).[10] Accordingly, plaintiff can-

---

7. Restatement (Second) of Torts § 402A, comment g at 351 (1965), approved in Bialek v. Pittsburgh Brewing Co., 430 Pa. 176, 242 A.2d 231, 236 (1968).

8. "The occurrence of a malfunction *in the absence of abnormal use and reasonable secondary causes* is evidence of a defective condition within the meaning of § 402A." 468 F.2d at 387 (emphasis added).

9. "Assuming that the appellant's reconstruction of the accident is correct, *liability does not automatically follow unless the appellant satisfied his burden of proof that the product was in a defective*

condition at the time that it left the hands of the particular seller." 463 F.2d at 678 (emphasis added), citing Woods v. Pleasant Hills Motor Co., 219 Pa.Super. 381, 281 A.2d 649 (1971).

10. "[A] plaintiff in a strict liability case can establish a 'defective condition' within the meaning of Section 402A by proving that the product functioned improperly *in the absence of abnormal use and reasonable secondary causes.*" 407 F.2d at 89–90 (emphasis added), citing Bialek v. Pittsburgh Brewing Co., 430 Pa. 176, 242 A.2d 231 (1968). *See also* authorities cited 407 F.2d at 90 n. 3.

not complain about our charge on this issue, since he was not entitled to go to the jury on the issue at all, and the charge we did give (discussed *supra*) gave him more than that to which he was entitled.[11]

## V.  *Conclusion*

Finding no merit in plaintiff's contentions, in accordance with the foregoing opinion we enter the following order.

## ORDER

And now, this 3rd day of May 1973, it is ordered that plaintiff's motion for new trial or for judgment n. o. v. is denied.

---

11. In his brief in support of the motion for new trial, plaintiff also asserts that our failure to charge in accordance with requests 12 and 15 was error. Since these points related to the defective blade theory also, he was not entitled to those points, for the same reasons given in the text for refusing points 8, 10, and 11.

Accordingly, we need not reach the procedural question of the effect, if any, of plaintiff's failure to raise these grounds in his motion itself, or of his failure to make specific objection at the time of trial. *See* F.R.Civ.P. 51; Shaw v. Lauritzen, 428 F.2d 247, 251 (3d Cir. 1970) ; N.T. 306–07.